JONES, Justice.
This case comes from the Circuit Court of Lee County where appellant was convicted of manslaughter and sentenced to nine years in the Mississippi State Penitentiary with four and one-half years suspended.
He assigns as error:
1. The giving of the State’s instructions.
2. The refusal of a peremptory instruction for appellant.
3. That the verdict was against the overwhelming weight of the evidence.
None of these assignments are well taken, and we affirm the case.
Appellant shot and killed one, Billy Floyd Henderson on or about December 31, 1963. His plea was self-defense, claiming the deceased came where appellant was employed, asked for a certain brand of whiskey and when advised the appellant did not have it, cursed, drew a gun and began shooting; that while deceased was yet shooting, appel *393 lant shot to protect himself. The theory of the State was expressed in an instruction wherein in substance the jury was told that they might believe the deceased fired the first shots, yet, if deceased had abandoned the combat and re-entered his pickup truck so that there was no danger to appellant — either real or apparent — when appellant shot deceased, he was guilty of murder or manslaughter.
This shooting occurred in Lee County near Tupelo. Henry Lee Holden, with deceased and others, about 8:00 that night was at a place called Shangri La, where he and they had a few drinks and had eaten. Later he and the deceased decided to go, where deceased met his death, to obtain more liquor. They went in a truck, deceased driving, and stopped about ten feet from the door of the very small building where the liquor was sold. The truck was facing north. When they arrived, appellant came from the building and asked the deceased what he wanted. Deceased asked him for some whiskey and told what brand he wanted. Holden said he did not know the reply appellant made but evidently he did not have the brand of whiskey.
The witness could not hear appellant because he was on the other side of the pickup, and the motor was running. But the deceased said, “I don’t have to take that off of nobody,” and stepped out of the truck onto the ground. His gun was behind the seat of the pickup. Deceased got the gun and started shooting into the ground. The appellant was walking back toward the building, according to this witness.
Cayson walked into the building, and witness ran, leaving deceased standing on the ground beside the pickup. Witness ran into the woods and was gone four or five minutes. As he was running, he heard some other shots. When witness returned to the building, appellant was there with the gun and told him to go on and get out of there. He did not then see the deceased; later, he returned with two other persons. The deceased’s father and Mr. Finch, his attorney, were at the Shangri La.
The witness, Mr. Hunt and Buddy Wood returned to the scene and carried deceased to the hospital in the pickup. Later this witness was recalled for further cross-examination and testified that at the Shan-gri La he and the deceased had a couple of drinks.
The decedent’s father, O. C. Henderson, testified he was at the Shangri La and received word his son was in trouble.. He asked Cliff Finch, who was eating there and had his car, which was warm (weather being very cold and ground covered with snow) to carry him to his son. They went to the top of the hill near the scene and the car began spinning. Mr. Henderson jumped out and ran to the pickup, looked inside, and saw his son with his head over the seat. He saw a hole in the back of his son’s head. The lights were still on in the pickup, and the heater and windshield wipers were still running. His son -vteis dead, and the father asked, “Who shot Billy?” Appellant replied, “I did, he shot at me first.” (This was the statement made by the appellant to each witness who talked to him after the shooting.) The father went back to the pickup, knowing that the son always had a rifle in the truck. He reached under the seat, pulled the gun out, and threw the scabbard on the back of the front seat. Mr. Finch took the rifle from him. The attorney left and the father went back to the truck, raised his son, kissed him, and looked at his head again. He saw the light shining through the bullet hole in the back of the pickup truck. There was a hole in the panel and also broken glass in the vent on the left hand side of the truck.
Pictures of the truck -were taken which showed a bullet hole in the left rear panel. It was in position to be in line with the back of the head of the driver of the truck while sitting in the driver’s seat.
*394 The defendant introduced a witness named James Earl Shumpert who testified he was at the building where the shooting occurred, until the shooting started. Then he ran. He heard four or five shots. Some of the shots sounded like a rifle and others like a pistol. On cross-examination, he said he heard four or five rifle shots and two or three pistol shots. He was asked, “And all the rifle shots were fired before any of the pistol shots?” His answer was, “That’s right, sir.” He testified the rifle sounded like an automatic rifle (which it was) and that there was one shot right after the other. He was asked, “And you were running out across the field and it was some little time before you heard the pistol shot, is that right ?” His answer was, “Yes, sir.”
The substance of the testimony was that the rifle shot first and after the rifle firing ceased, the pistol fired.
Appellant testified decedent shot at him three or four times before he stopped and the defendant shot twice, and did not know what happened after that. Appellant shot because the man was shooting at him. He said the decedent shot three or four times before he, appellant, made the last shot, and he, appellant, fired twice. When they came to the place decedent asked for two brands of whiskey and he, appellant, did not have either, saying, “I’m sorry I haven’t got it” to which decedent replied, “You’re a God dam liar, you have got it,” and appellant answered, “No, sir, I haven’t got it.” He then stated that the decedent drove off a little piece and he, appellant, went back to the fire. When he came out of the room, a bullet hit him in the forehead. Appellant swore, “He made about three or four shots before I shot airy one, and I shot twice and he shot his last one.”
Appellant testified the decedent was on the left hand side of the truck, got out of the truck onto the ground, and then started shooting. Appellant had his gun in his pocket with only two cartridges. On cross-examination the following occurred:
Q. Now, did I understand you to saw a' moment ago, before he made his last shot, you shot twice?
A. Yes, sir.
Q. Let me repeat this so there won’t be any misunderstanding, or any possibility of misunderstanding what you said. Before he made his last shot, you shot twice ?
A. Yes, sir.
Q. Now, Lee, does this mean he was still shooting at you when you shot him?
A. Yes, sir, when I shot.
Q. He shot at you some more after you fired your two shots.
A. He shot once or twice more, I know.
Q. After you had fired your two shots ?
A. Yes, sir.
Dr. Moore was the first witness introduced by the State. He testified he examined the body of the decedent and found a gun shot wound about one centimeter in diameter not quite one inch from the base of the skull, just to the left of the mid-line. There was blood from the wound and later from the mouth, nose and cerebral (brain) tissue was in the mouth and nose.
He asserted positively the bullet traveled through the brain causing instantaneous death. He also testified he examined appellant and found him with a jagged type wound in the mid forehead with soft tissue swelling around it, but x-rays were obtained of the skull which showed multiple small metallic foreign bodies lying up against the skull, but none penetrating the skull.
While it may be doubtful what was said by the parties at the truck, the appellant’s testimony differs from that of Mr. Holden. He said he did not hear what appellant said, but he did hear decedent, who stated, “I *395 don’t have to take that from nobody” rather than the cursing averred by appellant.
The evidence is overwhelming that the decedent got his gun from under the seat of his pickup, climbed to the ground, shot the gun several times, one of which evidently hit the door or glass panel of the building (which was broken); that he had gotten back into the truck, put his gun under the seat, and was on the driver’s side, evidently preparing to depart when the appellant shot through the back panel of the truck, and into the base of the skull of the decedent. One of appellant’s shots broke a small glass vent in the left hand door of the pickup. While the appellant says decedent was shooting at him when appellant shot at decedent and that decedent shot at appellant after appellant had fired his last shot, this is overwhelmingly contradicted by the statement of Shumpert who said the rifle fired several times and then after a little pause the pistol fired, as well as by the testimony of the doctor who swore the wound caused instant death and by the fact that decedent had restored his gun to its place under the seat.
The jury was amply justified in finding that when appellant shot the deceased, he, the decedent, had re-entered the truck, disposed of his rifle in the truck and was sitting in the driver’s seat so that appellant was in no danger, real or apparent.
The verdict was amply justified by the proof. We have examined the instructions and find no error regarding same.
The State received four instructions and the defendant twenty-three. The jury was amply instructed as to the law on self-defense and as stated was amply justified by the evidence in returning the verdict that it did.
Affirmed.
GILLESPIE, P. J., and PATTERSON, SMITH and ROBERTSON, JJ., concur.